IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:05CR145 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| JESUS HINOJOSA, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by Jesus Hinojosa (Hinojosa) (Filing No. 40). Hinojosa is charged in an Indictment (Filing No. 1) with conspiring with co-defendants Caesar Hinojosa, Salvador Rangel, Herberto Anguiano-Arrona, and Juan Rangel-Soria, to distribute and possess with intent to distribute in excess of 500 grams of methamphetamine from October 2004 to February 16, 2005, in violation of 21 U.S.C. § 846 (Count I). Jesus Hinojosa is also charged in Count II with the distribution of least than 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1). He is also charged in Count III with possessing a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c). Co-defendants Rangel-Soria and Salvador Rangel are charged in Counts IV and V, respectively, with the distribution of more than 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Co-defendant Caesar Hinojosa is charged in Count VI with possessing a firearm during the commission of a drug trafficking offense in violation of 18 U.S.C. § 924(c). All of the defendants are charged in Count VII with a criminal forfeiture of U.S. currency totaling $58,801.00, in violation of 21 U.S.C. § 853.

An evidentiary hearing was held on this motion on October 14, 2005. During the hearing the court heard the testimony of Officer Jeffrey Gassaway (Officer Gassaway) of the Omaha Police Department (OPD), Gloria Hinojosa, Jovani Licea-Rivera, Jesus Hinojosa, and Special Agent Ovidio DeLafuente, Jr. (Agent de Lafuente) of the Immigration and Customs Enforcement (ICE) of the Department of Homeland Security. The court also received in

evidence an OPD Permission to Search form (Exhibit 1) and an OPD Rights Advisory Form (Exhibit 2). A transcript (TR.) of the hearing was filed on November 2, 2005 (Filing No. 94).

Hinojosa asserts evidence was illegally seized by the OPD from Hinojosa's residence in Omaha, Nebraska, on February 16, 2005, and that statements Hinojosa made to OPD officers that day were involuntarily made and the fruits of an illegal search. The government counters with the assertion that Hinojosa consented to the search of his residence and voluntarily made a statement to OPD officers after being advised of *Miranda* rights.

## FINDINGS OF FACT

On February 16, 2005, Officer Gassaway, an eight year veteran of the OPD, was assigned to the gang suppression unit of the OPD Criminal Investigative Bureau had been conducting a joint narcotics investigation with the OPD narcotics unit (TR. 6-7). On that day, OPD officers made a controlled purchase of narcotics from a person named Rangel who was followed in a vehicle to Jesus Hinojosa's residence at 5247 South 22nd Street in Omaha, Nebraska (TR. 7; 34-35). The OPD officers had a search warrant for a residence around the corner from Hinojosa's residence which was connected to the narcotics activity ongoing that day (TR. 8). The OPD officers' plan was for some officers to execute the search warrant at the 18th Street address and other officers to conduct a knock-and-talk at Hinojosa's residence at 5247 South 22nd Street (TR. 8). A knock-and-talk is a technique whereby the officers simply go to a location, knock on the door, identify themselves as police officers, advise the occupant of their reason for being at the residence, and seek a consent of the occupant to enter and to conduct a search of the premises (TR. 8). This technique is used when the officers do not feel they have sufficient information to obtain a search warrant or where the officers do not have the time or want to take the time to secure a search warrant for the premises.

Officer Gassaway and five other officers walked to the door of 5247 South 22nd Street (TR. 9). The officers were dressed in blue jeans or black utility pants with a vest that identifies them as OPD officers (TR. 9). The officers were armed with their handguns holstered (TR. 10). Only a few officers accompanied Officer Gassaway to the door (TR. 9). Other officers

were sent to the back of the residence (TR. 34). Officer Gassaway recalled knocking on the door as a normal person would (TR. 10). Officer Gassaway recalled that a female answered the door with Jesus Hinojosa standing next to her (TR. 10). Officer Gassaway recognized Jesus Hinojosa as a person who had been involved in a controlled buy of narcotics earlier in the investigation and a person the officers believed to be the leader of the organization the officers were investigating (TR. 30).

Officer Gassaway recalled asking Hinojosa if he was Jesus Hinojosa (TR. 11). Hinojosa replied that he was (TR. 11). Officer Gassaway spoke to Hinojosa in English and Hinojosa replied in English (TR. 11). Officer Gassaway does not speak Spanish (TR. 11). Officer Gassaway recalled asking Hinojosa if Officer Gassaway could speak to him for just a second and Hinojosa responded "yes" (TR. 12). Officer Gassaway recalled that he asked Hinojosa if Officer Gassaway could step inside the doorway and Hinojosa said "yes" (TR. 12). After Officer Gassaway stepped two or three feet inside the doorway of the residence, Officer Gassaway recalled telling Hinojosa that the officers were conducting a narcotics investigation (TR. 12). Officer Gassaway recalled that Hinojosa was cordial and appeared unalarmed (TR. 12). When Officer Gassaway entered the residence he was the only officer inside the house with the other officers standing on the porch area (TR. 14). Officer Gassaway told Hinojosa that the officers had just made a drug transaction they followed an individual back to Hinojosa's residence who was in possession of OPD buy fund money (TR. 12-13). Officer Gassaway asked Hinojosa if he knew anything about that, and Hinojosa said "no" (TR. 14). Officer Gassaway asked if the officer could search the house for the money, and Hinojosa said "yes" (TR. 14). Once Hinojosa said yes, the remaining officers came inside the residence and Officer Gassaway had Hinojosa complete an OPD consent to search form (TR. 14; Exhibit 1).

On the Permission to Search Form (Exhibit 1), Officer Gassaway wrote "Permission to search done in English language," and had Hinojosa initial this modification of the form (TR. 16). Officer Gassaway explained that he made the modification to demonstrate that he and Hinojosa were conversing in English and that Hinojosa understood what was going on (TR. 16). Officer Gassaway recalled that after Hinojosa signed the form, the other officers came

into the residence and began to search the residence.  Officer Gassaway and Hinojosa walked to a bedroom off of the kitchen area for a private conversation (TR. 16-17).  There, Officer Gassaway read Hinojosa *Miranda* rights by means of an OPD Rights Advisory Form (Exhibit 2) (TR. 21).  After each separate advice, Hinojosa responded "si," Spanish for yes, indicating that he understood (TR. 21; 123; Exhibit 2).  Officer Gassaway then modified the form by writing "I fully understand my rights as read to me in the English language!" under which Hinojosa signed the form (TR. 21; Exhibit 2).  At some point Agent DeLafuente, who is fluent in the Spanish language, joined Officer Gassaway and Hinojosa in the bedroom while Officer Gassaway was advising Hinojosa of the *Miranda* rights (TR. 104-107).  OPD Officer Gonzalez was also present during some of that time (TR. 105).  Officer Gassaway primarily conducted the interview of Hinojosa in English with Agent DeLafuente clarifying some of the questions in Spanish (TR. 110-112).  Hinojosa made statements and indicated where weapons and money were in the residence (TR. 123).  Hinojosa was arrested and taken to OPD headquarters where Hinojosa was again interviewed by Officer Gassaway and Agent DeLafuente (TR. 112-113).

      Gloria Hinojosa testified she is the sister of Jesus Hinojosa (TR. 53).  She was present at the time the OPD officers came to her brother's residence on February 16, 2005 (TR. 54).  Ms. Hinojosa recalled that the police knocked on the door and the door was answered by Jovani (TR. 54).  Ms. Hinojosa testified several officers pushed Jovani aside, stated they were federal officers, and entered the residence (TR. 54).  Ms. Hinojosa testified at the time of the officer's knock on the door, she and her sister-in-law were in the bedroom and came out to see Jovani being pushed against the wall (TR. 60-61).  Upon entry, the officers had everyone go into the living room and handcuffed several people, including Jovani, Salvador Rangel, Jesus Hinojosa, Roberto, Raphael, and Jose (TR. 54).  When Ms. Hinojosa's sister-in-law asked if the officer had a search warrant, the officers said no (TR. 54).  When she asked again, the officers told her to shut up or she would be arrested and the children would be taken away (TR. 54).  Ms. Hinojosa testified her brother Jesus speaks a some English, but not very well (TR. 59).

Jovani Licea-Rivera (Licea-Rivera) testified he was from California but was in Jesus Hinojosa's residence on February 16, 2005, when the police officers came to the residence (TR. 64-65).  Licea-Rivera testified he heard a knock on the door and he got up to answer the door (TR. 65).  As soon as he opened the door, the police officers just rushed inside (TR. 65). Licea-Rivera identified Officer Gassaway as the officer who rushed in and grabbed Licea-Rivera by the arms (TR. 65-66).  Licea-Rivera testified the officers asked him nothing except who was in the house (TR. 66).  Licea-Rivera testified the officers handcuffed him and seated him in the living room (TR. 66).  Licea-Rivera recalled that Jesus Hinojosa was in the kitchen and when he ran to see what was happening, the officers handcuffed Hinojosa also (TR. 67). Licea-Rivera stated he is currently in the Douglas County Jail awaiting trial on state charges of robbery (TR. 67-68; 75-76).  He has known Jesus Hinojosa a couple of years and that Hinojosa speaks little English as they converse in Spanish (TR. 69).  Licea-Rivera stated he knew Jesus Hinojosa through Jesus's brother Jose who Licea-Rivera knew from California (TR. 77).  Licea-Rivera has known Jose Hinojosa for about five years (TR. 81).  After the incident at Jesus's house on February 16, 2005, and until Licea-Rivera's arrest in July of 2005, Licea-Rivera lived with Jose Hinojosa at a house in north Omaha (TR. 78-79). Licea-Rivera stated he had been in Omaha since January 2005 (TR. 74).  Licea-Rivera testified that when he or Gloria asked the officers for a warrant, Officer Gassaway stated that his boss had it (TR. 71-72).       Jesus Hinojosa testified that on February 16, 2005, he was in the bedroom of the residence at 5247 South 22nd Street with his wife and sister when the police came to the residence (TR. 86).  Jesus Hinojosa testified he lived at the residence with his wife, his three children, Jovani (Licea-Rivera), his brothers Jose and Raphael, and his sister Gloria (TR. 86).  Jesus Hinojosa testified that when the police knocked on the door, Jovani opened the door and when Jesus saw what was happening, Jesus ran into the living room where he was grabbed and handcuffed by the police officers (TR. 86).  Jesus said he was in the bedroom when he heard the knock on the front door (TR. 87).  When everyone else was taken to the living room, Jesus was brought to the bedroom where Officer Gassaway asked if Jesus knew the police were following someone who had come to the house (TR. 89).  Jesus testified he understood a little English and understood Officer Gassaway was asking about

drugs and guns (TR. 90). Jesus stated he was handcuffed while in the bedroom and was told to sign a paper by Officer Gassaway (TR. 90). Jesus stated Officer Gassaway told him that he (Jesus) could get 30 to 50 years in jail and that hey could take his children away from him and jail his wife (TR. 90-91). Jesus stated that he had already signed the paper when a Spanish speaking officer came into the bedroom (TR. 92). Jesus stated he told the officers where the guns and money were located because he was told he was in big trouble, he could spend 50 years in jail, and his children could be taken away by the government (TR. 92-93). Jesus denied that he gave officers permission to enter the residence and that he signed the paper giving permission to search when he and Officer Gassaway were alone in the bedroom (TR. 93-94). Jesus recalled signing only one paper and did not recall signing a permission to search form (Exhibit 1) (TR. 97).

Agent DeLafuente testified he was called by Sergeant Gonzalez to assist Officer Gassaway with an interview with Jesus Hinojosa on February 16, 2005, at 5247 South 22nd Street (TR. 104-105). Agent DeLafuente is fluent and certified in the Spanish language (TR. 102-104). When Agent DeLafuente arrived at the residence, he went to the bedroom where Officer Gassaway and Jesus Hinojosa were located (TR. 106). Sergeant Gonzalez was also present during some of the time Agent DeLafuente was with Officer Gassaway and Hinojosa (TR. 106). Agent DeLafuente assisted Officer Gassaway in advising Hinojosa of **Miranda** rights (TR. 106). Agent DeLafuente recalled no threats or promises being made to Hinojosa (TR. 108). Agent DeLafuente recalled that Hinojosa appeared to be sober and to understand his rights advisement (TR. 108). Agent DeLafuente recalled when he arrived at the residence he observed two or three officers in the living room trying to situate some adults and children (TR. 109). Officer DeLafuente recalled no officers raising their voices, screaming or yelling (TR. 109). He did recall there was some individual in the living room who kept on asking to see a warrant (TR. 109). However, Agent DeLafuente went directly to the bedroom when he arrived to assist Officer Gassaway in Hinojosa's interview (TR. 109). During the interview, Officer Gassaway asked questions of Hinojosa in English with Agent DeLafuente's assistance in Spanish translation (TR. 110 -112). Agent DeLafuente later assisted in an interview of Hinojosa by Officer Gassaway at Central Police Headquarters (TR. 112-113). During the

interview at the residence and during the interview at Headquarters, Officer DeLafuente recalled no threats or promises made to Hinojosa, no request to terminate an interview by Hinojosa, and no request by Hinojosa for an attorney (TR. 112-114).

From the testimony and exhibits presented and after weighing the credibility of all of the witnesses based upon the court's observation of the witnesses and their demeanor while testifying, the court discredits Officer Gassaway's recollection of the events in gaining entrance to the residence. The court finds that Officer Gassaway and officers of the Omaha Police Department entered the residence without the consent of Hinojosa or someone in a position to give such consent. The court finds the police officers followed a suspect who just participated in a drug transaction to the Hinojosa residence and entered the residence without a search warrant. Once inside the residence, Officer Gassaway secured Hinojosa's permission to search the residence and a waiver of Hinojosa's **Miranda** rights.

## LEGAL ANALYSIS

The Fourth Amendment prohibits "unreasonable searches and seizures" and assures "the right of the people to be secure in their persons, houses, papers, and effects." "[T]he 'touchstone of the Fourth Amendment is reasonableness.' Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." **Ohio v. Robinette**, 519 U.S. 33, 39 (1996) (**citing Florida v. Jimeno**, 500 U.S. 248, 250 (1991)). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." **Payton v. New York**, 445 U.S. 573, 589-90 (1980) (citations omitted); **see also United States v. Vance**, 53 F.3d 220, 221 (8th Cir. 1995). "Police officers may not enter or search a home without a warrant unless justified by exigent circumstances." **United States v. Ball**, 90 F.3d 260, 263 (8th Cir. 1996). The exigent-circumstances requirement does not, however, vitiate, but is in addition to, the need for probable cause. **See United States v. Duchi**, 906 F.3d 1278, 1282 (8th Cir. 1990).

"[S]eizures inside a home without a warrant are presumptively unreasonable." **Payton**, 445 U.S. at 586. Under the "exigent circumstances" exception, "the warrant requirement is

suspended 'when--in the press of circumstances beyond a police officer's control--lives are threatened, a suspect's escape looms, or evidence is about to be destroyed.'" ***United States v. Johnson***, 12 F.3d 760, 764 (8th Cir. 1993) (citations omitted). "The exigent circumstances exception to the warrant requirement is narrowly drawn." ***Ball***, 90 F.3d at 263. The government bears the burden of establishing that exigent circumstances existed. ***Id.***

In this case the government did not assert the existence of any exigent circumstances or present evidence of such exigency but justifies the entry of the Hinojosa residence on the basis of consent. The court finds the government's position to be untenable in light of the court's evaluation of the evidence. It appears the police burst into the residence after the door was opened and secured a consent to search after the illegal entry.

Because the defendant was subject to an illegal entry, the court must determine whether his consent to search and subsequent statements should be excluded, on that basis alone. The exclusionary rule prohibits the admission of evidence unconstitutionally obtained. ***Weeks v. United States***, 232 U.S. 383 (1914). The rule also applies to evidence, tangible and testimonial, which was derived, directly or indirectly, from the unconstitutionally obtained evidence, i.e., the "fruit of the poisonous tree." ***Wong Sun v. United States***, 371 U.S. 471, 487 (1963); ***Nardone v. United States***, 308 U.S. 338 (1939); ***Silverthorne Lumber Co. v. United States***, 251 U.S. 385 (1920); ***United States v. Fellers***, 397 F.3d 1090, 1094 (8th Cir. 2005). Even though the exclusionary rule may require the exclusion of all evidence obtained by exploitation of an illegal search and seizure, the evidence may still be admissible into evidence if the evidence is gained by means sufficiently distinguishable to be purged of the primary taint of the illegality. To that extent, three general exceptions have been carved from the exclusionary rule. The first exception has been called the "attenuated connection" where the chain between the challenged evidence and the primary taint of illegality is so long or only linked by sophisticated argument that exclusion of the evidence is not warranted. **See** ***Wong Sun***, 371 U.S. at 487-88; ***Nardone***, 308 U.S. at 338. The second exception has been called the "independent source" exception where evidence is admissible if the government can show it derived the evidence from a lawful source independent of the illegal conduct giving rise to the primary taint. **See** ***Silverthorne Lumber Co.***, 251 U.S. at 385. The third

exception has been labeled the "inevitable discovery" doctrine where the government can establish that it would have inevitably discovered the challenged evidence without reference to the illegal conduct giving rise to the primary taint. **See *Nix v. Williams***, 467 U.S. 431 (1984).

The government made no showing there was either an independent source for or the inevitable discovery of the evidence sought to be suppressed in this case. Suppression is required unless the government can show there is only an attenuated connection between the illegal entry into the residence and the later consent to search and statements. Applying equally to the consent to search and the statements, the Supreme Court stated in ***Brown v. Illinois***, 422 U.S. 590 (1975):

> Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, ***Wong Sun*** requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." 371 U.S. at 486, 83 S. Ct. at 416. ***Wong Sun*** thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment. If ***Miranda*** warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. **See *Davis v. Mississippi***, 394 U.S. 721, 726-727, 89 S. Ct. 1394, 1397, 22 L. Ed.2d 676 (1969). Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge [sic] that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving ***Miranda*** warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words."

***Id.*** at 601-03. The ***Brown*** court went on to identify four factors relevant to the determination of whether statements made to the police after an illegal seizure are admissible or sufficient to constitute voluntary consent: 1) whether the suspect has been advised of his ***Miranda***

rights prior to making the statements at issue;  2) the temporal proximity of the statements to the Fourth Amendment violation; 3) the existence of intervening causes between the violation and the statements; and 4) the purpose or flagrancy of the official misconduct.  **Id.** at 603-04.  Demonstrating a confession was "an act of free will [sufficient] to purge the primary taint of the unlawful invasion" is, of course, a function of circumstantial evidence, with the burden of persuasion on the state.  **Kaupp v. Texas**, 538 U.S. 626, 632-33 (2003) (**quoting Wong Sun**, 371 U.S. at 486).

The court finds that in applying the **Brown** factors, the government has not carried its burden to show that Hinojosa's consent or waiver of his **Miranda** rights were "'sufficiently an act of free will to purge the primary taint' [of the illegal entry]."  **Wong Sun,** 371 U.S. at 486.  Where a confession is an act of free will sufficient to purge the primary taint of illegality, the confession may be admissible.  **Wong Sun v. United States**, 371 U.S. 471 (1963).  The burden of persuasion to demonstrate such purgation lies with the government.  **See Brown** 422 U.S. at 604.  In this case, Hinojosa was given advice of his rights under **Miranda v. Arizona**, 384 U.S. 436 (1966).  But such warnings, "*alone* and *per se*, cannot always . . . break, for Fourth Amendment purposes, the casual connection between the illegality and the confession."  **Brown**, 422 U.S. at 603 (emphasis in original). Here, Hinojosa was interrogated in a bedroom in his home immediately after several officers entered the home without permission.  Under the circumstances, the court finds the consent to search and statements should be suppressed as being given shortly after the outset of the illegal entry; and there is no evidence of sufficient intervening cause to expunge the taint of the illegal entry and the statements should not be used against the defendant at trial.  Therefore, the court will recommend the evidence found and all statements made by Hinojosa on February 16, 2005, after the illegal entry at the residence at 5247 South 22nd Street, be suppressed.  Upon consideration,

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Hinojosa's motion to suppress (Filing No. 40) be granted.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any such objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 22nd day of December, 2005.

BY THE COURT:

s/Thomas D. Thalken<br>
United States Magistrate Judge